[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 738 
 Procedural History and Facts
¶ 1. This case is before us challenging the judgment of the Chancery Court of Sunflower County awarding the custody of minor child, Jeffery Dustin Fulk, to the biological father, Jeffery A. Fulk. Aggrieved, Rhonda Fulk perfected this timely appeal.
¶ 2. Rhonda and Jeffery were married on September 11, 1999. Their marital bliss ended in separation in September of 2000. One child was born of this union on January 20, 2001. After the birth of the baby, Rhonda briefly returned to the marital home. Further problems ensued, causing Rhonda to take the baby and leave the home permanently on February 1, 2001. On February 6, 2001, Jeffery filed for divorce on the grounds of "cruel and inhuman treatment"[sic], adultery and irreconcilable differences. He also was seeking custody of the child. A temporary hearing was held on February 28, 2001, where Jeffery was granted temporary custody of the child. Rhonda did not appear at this hearing.
¶ 3. On April 5, 2001, Rhonda filed an answer to the divorce complaint admitting irreconcilable differences between the parties. On April 30, 2001, Rhonda filed an amended answer and counterclaim requesting custody of the child. On May 4, 2001, the parties filed a joint motion to withdraw all previously filed fault grounds and defenses relating to the divorce, agreeing to a divorce based on irreconcilable differences.
¶ 4. The custody matter was heard on May 8, 2001. Following testimony from the parties and various witnesses, Chancellor Weathersby granted the divorce and awarded sole custody to Jeffery. The chancellor granted Rhonda supervised visitation on Sunday mornings at McDonald's for a minimum of one hour. Furthermore, the chancellor ruled that Rhonda's father was prohibited from visiting with the child.
¶ 5. Dissatisfied with that ruling, Rhonda comes before this Court citing four issues for our review:
 I. The chancellor erred as a matter of law in failing to analyze and make appropriate findings as to each factor under Albright v. Albright, 437 So.2d 1003, 1005 (Miss. 1983);
 II. The chancellor erred by improperly placing too much weight on one individual Albright factor;
 III. The chancellor erred by not considering a proper application of the Albright test to the facts of this case which requires reversal; and
 IV. The chancellor erred by entering an order concerning visitation which is inconsistent with the general Mississippi guidelines.
 A. Given the absence of any evidence of harm or danger to the child, the chancellor erred and abused her discretion by drastically limiting Rhonda's visitation by ordering supervised visitation and prohibiting the child from having contact with his maternal grandfather.
 B. The chancellor erred and abused her discretion by allowing the mother only a negligible amount of visitation.
¶ 6. Upon review of the record and legal precedent, we reverse and remand this *Page 739 
cause for further hearings consistent with this opinion.
 Standard of Review
¶ 7. Our standard of review is clear. "Chancellors are vested with broad discretion, and this Court will not disturb the chancellor's findings unless the court's actions were manifestly wrong, the court abused its discretion, or the court applied an erroneous legal standard."Mixon v. Mixon, 724 So.2d 956, 959 (¶ 8) (Miss.Ct.App. 1998). "However, where the chancellor improperly considers and applies theAlbright factors, an appellate court is obliged to find the chancellor in error." Hollon v. Hollon, 784 So.2d 943, 346 (¶ 11) (Miss. 2001) (citing Jerome v. Stroud, 689 So.2d 755, 757 (Miss. 1997)).
 Legal Analysis I. The chancellor erred as a matter of law in failing to analyze and make appropriate findings as to each factor under Albright v. Albright, 437 So.2d 1003, 1005 (Miss. 1983).
¶ 8. The polestar consideration in child custody cases is the best interest and welfare of the child. Albright v. Albright, 437 So.2d 1003, 1005 (Miss. 1983). The Albright case provided Mississippi courts with guidelines for determining the best placement of the child after custody disputes. These factors include: (1) age, health and sex of the child; (2) determination of the parent that had the continuity of care prior to the separation; (3) which has the best parenting skills and which has the willingness and capacity to provide primary child care; (4) the employment of the parent and responsibilities of that employment; (5) physical and mental health and age of the parents; (6) emotional ties of parent and child; (7) moral fitness of parents; (8) the home, school and community record of the child; (9) the preference by law; (10) stability of home environment and employment of each parent; and (11) other factors relevant to the parent-child relationship. Albright, 437 So.2d at 1005. Marital fault should not be used as a sanction in the custody decision, nor should differences in religion, personal values and lifestyles be the sole basis for custody decisions. Id.
¶ 9. In order to lend some degree of clarity to the chancellor's decision process and thereby make an appellate review as meaningful as possible, the supreme court has held that the chancellor should properly make findings of fact on the record as to the various factors underAlbright v. Albright. Sobieske v. Preslar, 755 So.2d 410, 413 (¶ 12) (Miss. 2000). It is not enough for the chancellor to simply state that he considered these factors. Hamilton v. Hamilton, 755 So.2d 528, 531 (¶ 10) (Miss.Ct.App. 1999).
¶ 10. Rhonda asserts that the chancellor erred because she failed to consider each and every Albright factor thoroughly and on the record following Powell v. Ayers, 792 So.2d 240, 244 (¶ 8) (Miss. 2001). Jeffrey concedes that the chancellor failed to enumerate each and every factor of Albright; however, he argues that this error may be corrected by the chancellor simply issuing a separate opinion consistent with the guidelines of Albright and Powell and not hearing a new trial.
¶ 11. Upon examination of the bench ruling made by the chancery court, it is our opinion that the chancellor did commit reversible error. The chancellor considered some Albright factors but not all. Furthermore, she failed to give sufficient findings as to why she came to the conclusions she did. As Chancellor Weathersby stated, both parties start off "on equal footing." The chancellor's duty was to evaluate each factor and determine which parent would be favored. *Page 740 
¶ 12. The chancellor determined that all of the factors she examined were in favor of the father. Specifically, that the continuity of care factor favored the father, as the baby had been in his care since the enforcement of the temporary custody order. Furthermore, the court ruled that Jeffery had "done a good job with him." Considering parenting skills, the chancellor found that the father has "good skills" but offers no examples. The father's employment weighed in his favor as the mother had no income at the time of the trial. Concerning the health of the child, the court was under the impression that the father has been administering the baby's medicine properly. The court determined that the mother's affair with an emotionally unstable woman did not speak well of the mother's moral fitness and therefore ruled that moral fitness of the home environment would weigh in the father's favor. The chancellor favored the father's stability of the home over that of the mother's but did not offer an explanation of why.
¶ 13. The chancellor did not discuss the factor of the emotional ties between the child and parent and, more importantly, the age and sex of the child. Additionally, as the child was very young in age, the chancellor did not need to discuss the community and school record of the child but she failed to disclose this on the record. The "tender years doctrine" is only a presumption that essentially states that if the mother of a young child of tender years is found to be fit, then she should have custody of the child. Lee v. Lee, 798 So.2d 1284, 1289 (¶ 17) (Miss. 2001). At the time of this trial, the Fulk baby was only two and a half months old. Although the Mississippi Supreme Court, along with this Court, has significantly weakened the once strong presumption of the "tender years doctrine," it is still a viable consideration which should have been discussed. See Sobieske, 755 So.2d at 413. Furthermore, the chancellor did not offer a valid explanation of how she arrived at the conclusions she did. Simply dictating that the father was favored without explaining why he was favored is not enough. Our job, as an appellate court, is to review the chancellor's decision and determine if it was "manifestly erroneous based on a proper analysis of each of the applicable Albright factors. This task becomes futile when chancellors fail to consider and discuss each factor when rendering decisions." Powell v. Ayars, 792 So.2d 240, 244 (¶ 10) (Miss. 2001). As such, we reverse and remand for further findings by the chancellor.
 II. The chancellor erred by improperly placing too much weight on one individual Albright factor.
¶ 14. Rhonda argues that the chancellor erred by placing too much emphasis on the fact that Rhonda had an adulterous affair with another women. Jeffery counters that the chancellor was not concerned that the affair was of the lesbian nature but that the person Rhonda had the affair with was a severely emotionally unstable person who testified that she would still be a part of Rhonda's life as a friend and, consequently, be around the baby. Jeffery argues that the chancellor, in determining what was best for the baby, ruled that this unstable person would not be a good influence or provide a good environment for raising a small child.
¶ 15. Albright dictates that "difference in religion, personal values and lifestyles" would not be the sole basis for custody decisions. Albright, 437 So.2d at 1005. Our supreme court addressed a similar issue in 2001 and held that too much weight was placed upon the "moral fitness" factor based upon the mother's homosexual affair and reversed the decision of the chancery court. Hollon v. Hollon, *Page 741 784 So.2d 943, 949-50 (¶¶ 25-27) (Miss. 2001). The chancellor in the case at bar stated that although both Rhonda and her female counterpart in the affair testified that the sexual relationship was over, it was her opinion and that of the court, that the sexual relationship was indeed not over. Furthermore, the chancellor found that it was "unacceptable for any child to be around this type of behavior." Apparently, Chancellor Weathersby forgot that the father was the instigator in the triangle relationship, not the mother. All three parties testified that Jeffery was involved in the affair and Jeffery even testified that he had oral sex with the second woman involved. As our supreme court has previously held, "it is of no consequence that a mother was having an affair with a woman rather than a man." Plaxico v. Michael, 735 So.2d 1036, 1039-40 (¶ 15) (Miss. 1999). Therefore, it was error for the chancellor to have relied so heavily on the affair, as it was not just Rhonda's affair due to Jeffery's willingness to be an eager participant.
 III. The chancellor erred by not considering a proper application of the Albright test to the facts of this case which requires reversal.
¶ 16. The facts in this case are unusual, as skeletons are in both parties' closets. The record indicates that Rhonda and Jeffery's relationship was unsteady during their entire courtship and marriage. To say that Jeffery and his father-in-law are not friendly with one another is an understatement. Rhonda is a young mother who does not have a source of income. She lives with her parents and a younger sibling. Both of her parents are unemployed and rely on "checks" as means for survival. As we have previously mentioned, Rhonda and Jeffery had a sexual relationship with one of Rhonda's female friends. Jeffery admits to having used drugs and alcohol heavily, although he claims to have now stopped using the addictive toxins. However, Rhonda entered into evidence photographs of marijuana and other drug paraphernalia located inside Jeffery's dresser drawers which were taken on the first day of February, the day of the final separation.
¶ 17. Two incidents are very disturbing to this Court in our review of the record. Specifically, the time when Jeffery "forgot" his wife was in his home and padlocked her inside the house since it was his habit to padlock the door. At that time, Rhonda was pregnant and trapped inside the home. Her father had to come and take the door off of the hinges to allow his daughter out of the house. Secondly, we view the domestic disturbance call which ended when the police arrested Jeffery for threatening to kill Rhonda and her family with a claw hammer. Jeffery was charged with resisting arrest and domestic violence. Jeffery proceeded to plead guilty to all charges against him and was sentenced to anger management classes. It is not clear from the chancellor's opinion that she considered these incidents. Her bench ruling states, "I find that the father may have done some things in the past he is not proud of, but the Court thinks that the responsibility of fatherhood has matured him. As the Court said before, I view the marital troubles as being part of his violent temper troubles." We are of the opinion these incidents should have been addressed and considered in making theAlbright findings. It was error for the chancellor to ignore such matters.
 IV. The chancellor erred by entering an order concerning visitation which is inconsistent with the general Mississippi guidelines.
¶ 18. The chancellor granted total custody to Jeffery, the father of the baby. Rhonda was granted a minimum of one *Page 742 
hour of visitation at a McDonald's on Sunday mornings beginning at 8:00 a.m. Rhonda's father was prohibited from being present during these visits. Rhonda claims it was error for this restricted visitation to be imposed as it flies in the face of Mississippi's general visitation guidelines. Jeffery argues that the chancellor was only dictating what was in the best interest of the child by protecting the child from interaction with Rhonda's friend from the affair and from the "friction" between Jeffery and the maternal grandfather. We agree with Rhonda and reverse the decision of the chancellor.
 A. Given the absence of any evidence of harm or danger to the child, the chancellor erred and abused her discretion by drastically limiting Rhonda's visitation by ordering supervised visitation and prohibiting the child from having contact with his maternal grandfather.
 B. The chancellor erred and abused her discretion by allowing the mother only a negligible amount of visitation.
¶ 19. As these two issues are related, we will review them together. The chancellor is given broad discretion when determining the appropriate visitation for the non-custodial parent and the limitations thereon. Harrington v. Harrington, 648 So.2d 543, 545 (Miss. 1994). During deliberation, the best interest of the child is viewed as well as the rights of the non-custodial parent, recognizing the need to maintain a healthy, loving relationship between the parent without paramount custody and the child. Id.
¶ 20. This Court will not reverse a chancellor's findings as long as they are supported by substantial evidence in the record. Tedford v.Dempsey, 437 So.2d 410, 417 (Miss. 1983). However, we will reverse when the chancellor is "manifestly in error in his finding of fact or has abused his discretion." Hammett v. Woods, 602 So.2d 825, 828 (Miss. 1992).
¶ 21. The Mississippi Supreme Court dictated in Dunn v. Dunn,609 So.2d 1277, 1286 (Miss. 1992), that there "must be evidence presented that a particular restriction on visitation is necessary to avoid harm to the child before a chancellor may properly impose the restriction. Otherwise, the chancellor's imposition of a restriction on a non-custodial parent's visitation is manifest error and an abuse of discretion." Id. Examining the case at bar, no compelling evidence was presented that the child was in any way threatened or placed in harm's way by visiting in the home of the maternal grandparents where the mother of the child is currently living. Prior to the temporary hearing, the baby and Rhonda were living there and no harm resulted. By restricting Rhonda's visitation with her child of very tender months, not years, to a public restaurant during the early morning hours on a Sunday, the chancellor abused her discretion and we must reverse.
¶ 22. The problems between Jeffery and Mr. Hopkins, Rhonda's father, are just that, problems between the two men. The child was not harmed, nor was the baby even born when the domestic disturbance charge was initiated. The chancellor did not have a basis for her restriction and clearly was in error in limiting the visitation with the maternal grandfather.
¶ 23. The supreme court has made it clear that "the objective in visitation arrangements is that the non-custodial parents and their children `should have as close and loving relationship as possible despite the fact that they may not live in the same house.'" Mixon v.Mixon, 724 So.2d 956, 961 (¶ 15) (Miss.Ct.App. 1998) (quoting Dunn, 609 So.2d at 1286). *Page 743 
Restrictions on the visitation rights of the non-custodial parent "must be supported by evidence demonstrating that the chid would be harmed in some way absent the restriction." Id. The record and the chancellor's decision is devoid of any such evidence that would support a restriction against overnight visitation and visitation with the maternal grandfather.
¶ 24. "Overnight visitation with the non-custodial parent is the rule, not the exception; indeed, a non-custodial parent is presumptively entitled during reasonable times to overnight visitation with the children." Cox v. Moulds, 490 So.2d 866, 870 (Miss. 1986). The only bit of evidence we found that would potentially bring doubt into the chancellor's mind was the fact that Rhonda and her family had the water and gas cut off for failure to pay the bills. The gas was extinguished one evening, but service was returned the next day. The water was off for a longer period of time, but the baby was not living at the home during this period. As an appellate court, we cannot speculate as to why the bills did not get paid. We are not aware of any unexpected expense during the course of that month that would have prohibited the Hopkinses from paying the bills for the utilities. Regardless, the baby was not harmed by this problem. Again, we could not find any other circumstance that would cause harm thus calling for an overnight visitation restriction. The chancellor was in error and we must reverse.
 Conclusion
¶ 25. We are reversing for the reasons enumerated in the foregoing opinion and remanding for sufficient findings consistent with this opinion. After appropriate findings are determined, if the chancellor again grants paramount care and custody to the father, it is our opinion that the mother shall be granted overnight and unrestricted visitation, provided no evidence of harm to the child was presented.
¶ 26. THE JUDGMENT OF THE SUNFLOWER COUNTY CHANCERY COURT ISREVERSED AND REMANDED. COSTS ARE TAXED AGAINST THE APPELLEE.
McMILLIN, C.J., KING AND SOUTHWICK, P. JJ., THOMAS, LEE, IRVING,MYERS, CHANDLER AND BRANTLEY, JJ., CONCUR.