[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 253 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 254 
¶ 1. April Thornell Lawrence appeals the chancellor's decision to grant partial summary judgment in favor of William Andrew Lawrence and award of child custody to Andy. *Page 255 
 ¶ 2. April contends that the chancellor erred: (1) in granting summary judgment in favor of Andy on her allegation of adultery; (2) by failing to follow the mandates of the custody statute when evidence of domestic violence was presented; (3) in the determination of custody of the couple's minor children; and (4) in the determination of visitation. We find reversible error. Therefore, we reverse and remand the chancellor's judgement.
 FACTS ¶ 3. April and Andy were married on May 16, 1998. They had two children. Noah Andrew was born on July 19, 1999. Emma Katherine was born on July 30, 2000. At the time of the hearing, Noah was five years old, and Emma Kate was four years old. They are now ages seven and six, respectively.
 ¶ 4. In the spring of 2003, April and Andy separated for approximately a week. When Andy returned to the marital home, April confronted him about rumors of an affair. At first, Andy denied the affair, but later admitted the affair and begged forgiveness. On April 17, 2003, April filed her initial complaint for divorce on the grounds of adultery or, in the alternative, irreconcilable differences. April and Andy, even though the complaint for divorce was filed, continued to reside together and were not legally separated. Affidavits from April and Andy indicate that Andy admitted his affair, which occurred in 2002. They attempted to reconcile, but April's complaint for divorce was never dismissed.
 ¶ 5. In the fall of 2003, April began to ask Andy to leave the marital residence, and the divorce proceedings were resumed. They continued to reside in the same household.
 ¶ 6. In December of 2003, April met Brian Sellers. The following May, April moved from the marital home into a rental home in Caledonia.
 ¶ 7. In June of 2004, the chancellor entered a temporary order that granted April custody of the two minor children and ordered Andy to pay child support. For several months prior to the temporary order, Andy did not deposit his paycheck into the couple's joint bank account and did not provide any financial support for the children.
 ¶ 8. On August 4, 2004, Andy filed a motion for summary judgment. He claimed that he was entitled to judgment on the claim of adultery because April condoned his affair. The result was that Andy's adultery could no longer support the grounds for divorce pled in April's complaint for divorce. The chancellor granted the motion, and the parties proceeded to trial on Andy's complaint for divorce on the grounds of adultery.
 ¶ 9. The chancellor granted Andy a divorce and awarded him custody of the two minor children. The chancellor also divided the marital assets of the parties. However, the division of assets was not challenged on appeal.
 STANDARD OF REVIEW ¶ 10. The standard of review in this case presents two separate standards for us to consider.
 ¶ 11. The first issue requires that we consider the chancellor's decision to grant a motion for partial summary judgment. This Court employs a de novo standard of review of a lower court's grant or denial of summary judgment and examines all the evidentiary matters before it admissions in pleadings, answers to interrogatories, depositions, affidavits, etc.McMillan v. Rodriguez, 823 So.2d 1173, 1176-77 (¶ 9) (Miss. 2002). The evidence must be viewed in the light most favorable *Page 256 
to the party against whom the motion has been made.Id. at 1177 (¶ 9). If, in this view, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law, summary judgment should forthwith be entered in his or her favor. Id.
Issues of fact sufficient to require reversal of a summary judgment obviously are present where one party swears to one version of the matter in issue and another says the opposite.Id.
 ¶ 12. The second and third issues are typical divorce, child custody and child support issues. Findings of the chancellor, as to these issues, will not be disturbed or set aside on appeal unless the decision of the chancellor was manifestly wrong and not supported by substantial credible evidence, or unless an erroneous legal standard was applied.Pittman v. Pittman, 652 So.2d 1105, 1108 (Miss. 1995). For questions of law, our standard of review is de novo.Harrison County v. City of Gulfport, 557 So.2d 780,784 (Miss. 1990).
 ANALYSIS I. Did the chancellor err in granting a partial summary judgment on April's ground of divorce for adultery?
 ¶ 13. On August 4, 2004, Andy filed a motion for summary judgment on April's "claim for divorce on the ground of adultery for reason of condonation of Andy. The motion contained no additional information.[1] The motion did not set forth the factual or legal basis upon which Andy relied to move for summary judgment. No affidavits, depositions, or other pleadings were attached. On September 22, 2004, the chancellor signed an order granting April additional time to respond to the motion and set the hearing for October 11, 2004.[2] On October 1, 2004, April filed her response and affidavit. On October 12, 2004, the chancellor executed an order granting partial summary judgment. The order provides that it is supported by April's deposition and opposed by her affidavit. The record next contains a document, filed on October 19, 2004, entitled "Designation of excerpts of deposition testimony of April Thornell Lawrence considered by the court in ruling on motion for summary judgment." Attached to this document are several pages from April's deposition transcript.
 ¶ 14. Rule 56(c) of the Mississippi Rules of Civil Procedure provides that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Our standard of review of motions granting summary judgment is de novo. McMillan,823 So.2d at 1176-77 (¶ 9).
 ¶ 15. We begin our de novo review by noting the discrepancies in the record. Rule 56(c) expressly provides that summary judgment may be rendered if the pleadings, depositions, etc. "on file" establish *Page 257 
no genuine issue of material fact and that a party is entitled to a judgment as a matter of law. It is certainly contrary to Rule 56(c) for the chancellor to consider documents that are not "on file" prior to the hearing on the motion. M.R.C.P. 6(b). See also Richardson v. APAC-Miss., Inc.,631 So.2d 143, 146 (Miss. 1994). We conclude that Rule 56(c) requires that all matters upon which a party or the court may rely must be filed with the clerk and served on the other party prior to the hearing. Failure to do so is fatal to the motion.
 ¶ 16. The preceding finding notwithstanding, we examine the issue raised. Andy's argument was that April could no longer assert adultery as a grounds for divorce. Although it was not stated in the motion, we can gather from the chancellor's subsequent opinion that this argument was based on the fact that April resumed sexual relations with Andy after she had knowledge of his extramarital affair. Thus, Andy claimed that April condoned Andy's adultery by resuming marital relations.
 ¶ 17. April argued that condonation was conditional on Andy's continued good behavior. In Wood v. Wood,495 So.2d 503, 505 (Miss. 1986), the supreme court held:
 The defense of condonation is recognized in our law. Stribling v. Stribling, 215 So.2d 869, 870
(Miss. 1968); Starr v. Starr, 206 Miss. 1, 39 So.2d 520, 523 (1949). Condonation is the forgiveness of a marital wrong on the part of the wronged party. Condonation may be expressed or implied, [citations omitted]. The mere resumption of residence does not constitute a condonation of past martial sins and does not act as a bar to a divorce being granted. Compare Miss. Code Ann. § 93-5-4 (1972). Condonation, even if a true condonation exists, is conditioned on the offending spouse's continued good behavior. If the offending party does not mend his or her ways and resumes the prior course of conduct, there is a revival of the grounds for divorce. Manning v. Manning, 160 Miss. 318, 321, 133 So. 673, 674 (1931).
 In practical effect, condonation places the offending spouse on a form of temporary probation. Any subsequent conduct within a reasonable time after resumption of cohabitation which evidences an intent not to perform the conditions of the condonation in good faith, may be sufficient to avoid the defense of condonation, even though the conduct so complained of in and of itself may not be grounds for divorce. Armstrong v. Armstrong, 32 Miss. 279, 283
(1856). An entire course of conduct rule applies. A party's conduct both before and after the alleged condonation can be joined together to establish the cause for divorce. Armstrong v. Armstrong, 32 Miss. 279, 283 (1856). Cf. Bias v. Bias, 493 So.2d 342, 343 (Miss. 1986).
 ¶ 18. In her response to the motion for partial summary judgment, April offered her affidavit where she testified about her belief that Andy resumed the marital relationship "merely as a ploy to defeat the grounds of adultery" and that he "has continued to have an affair."
 ¶ 19. We conclude that April's affidavit presented a genuine issue of material fact and Andy was not entitled to a judgment as a matter of law. In Wood, the supreme court held that:
 [a]ny subsequent conduct within a reasonable time after resumption of cohabitation which evidences an intent not to perform the conditions of the condonation in good faith, may be sufficient to avoid the defense of condonation, even *Page 258 
though the conduct so complained of in and of itself may not be grounds for divorce.
Wood, 495 So.2d at 505 (emphasis added). Based on this language, Andy's intent in the resumption of the marital relationship is indeed an issue to be determined by the chancellor. Simply engaging in the act of sex does not seal the defense of condonation. Thus, April's personal belief that Andy resumed the marital relationship "merely as a ploy to defeat the grounds of adultery" presents a genuine issue of material fact in dispute that does not entitle Andy to a judgment as a matter of law on his defense of condonation.
 ¶ 20. Accordingly, we reverse the chancellor's entry of a partial summary judgment, and we remand for further proceedings consistent therewith.
 II. Did the chancellor err in his consideration and application of the Albright factors ?
 ¶ 21. Mississippi Code Annotated Section 93-13-1
(Rev. 2004) provides that parents are "the joint natural guardians of their minor children and are equally charged with their care, nurture, welfare, and education, and the care and management of their estates" and that "neither has any right paramount to the right of the other concerning custody."
 ¶ 22. In Albright v. Albright, 437 So.2d 1003,1005 (Miss. 1983), the supreme court "reaffirmed the rule that the polestar consideration in child custody cases is the best interest and welfare of the child." The court then stated a number of "factors to be considered"[3] and concluded that "[m]arital fault should not be used as a sanction in custody awards. . . . Differences in religion, personal values and life-styles should not be the sole basis for custody decisions." Id.
 ¶ 23. The Albright factors are a guide. They are not "the equivalent of a mathematical formula." Lee v.Lee, 798 So.2d 1284, 1288 (¶ 15) (Miss. 2001). Here, the chancellor considered"[3] and made findings on each of theAlbright factors. We do recognize the chancellor's statements that "the Biblical illustration of this dilemma is the story of Solomon." He also characterizes this case as a "close call." These statements by the chancellor do not change the standard of review. However, it certainly indicates to us, as a reviewing court, that the chancellor's findings require careful and detailed examination. After having reviewed the record and the chancellor's findings, we find reversible error in the chancellor's consideration of the followingAlbright factors.
1. Continuity of care prior to separation
 ¶ 24. April argues that the chancellor failed to properly address this factor. She is correct. The chancellor considered this factor as the "primary care giver at the time of separation." The *Page 259 
chancellor concluded "[t]he time of separation is May 2004. At that time, the primary care giver was the father. This factor favors the father." The chancellor simply relied on who was the caregiver at a particular date, the date of separation. The chancellor did not consider Andy's actions that led to the separation, i.e. his infidelity. The chancellor did not consider who provided continuity of care of the childrenprior to separation. See Caswell v. Caswell,763 So.2d 890, 893 (¶ 8) (Miss.Ct.App. 2000) (holding chancellor must consider continuity of care prior to and after separation).
 ¶ 25. The evidence indicated that, during the course of the marriage, April was the primary caregiver. During a brief period prior to the physical separation of the parties, April worked at Lowe's. This job required April to work the night shift two or three nights a week. It is important to note that April worked at this job during the period that Andy refused to provide financial support for the children. April testified that she quit this job because she missed her children.
 ¶ 26. Andy did in fact take a more active role in the care of the children during the final months of the marriage. However, the chancellor granted April custody of the children in his temporary order entered on June 14, 2004. Clearly, based on the chancellor's temporary order, April was the primary caregiver at and prior to the time of separation as well as the custodial parent during the five month period between the temporary order and the final judgment of divorce. It was clearly erroneous for the chancellor to weigh this factor in favor of Andy. Instead, this factor weighs in favor of April.
2. Which parent has the best parenting skills
 ¶ 27. The chancellor found that each parent has the necessary basic parenting skills. The chancellor then stated that the "proof does not show one to be superior to the other on this factor." However, the chancellor recognized that there was evidence of poor judgment on the part of both Andy and April. He then weighed the factor in favor of Andy. The chancellor's conclusion is in conflict with his findings of fact. If neither parent appears to have superior parenting skills, the factor should favor neither. If the chancellor concludes that one is superior to the other, he must so find and state his reasons.
 3. Willingness and capacity to provide primary child care
 ¶ 28. The chancellor found that "[b]ased on the actions taken by the mother after filing for divorce, . . . the father demonstrated the stronger willingness to provide primary care. As to capacity to provide primary care, . . . both parents have the capacity without weight to either on this part of the factor. The factor favors the father." Here again, the chancellor gives us only a conclusion and not the facts upon which he relies to make this conclusion. The chancellor's opinion infers that he is referring to April's post-separation relationship with Brian. The chancellor places much greater emphasis on April's infidelity, while seemingly ignoring Andy's prior acts of infidelity. This is clearly in error. The record shows that both parents are willing to provide primary care for the children.
 ¶ 29. We cannot ignore the significant evidence that Andy failed to provide support for his family for nearly six months. Andy testified that he did not deposit his paycheck into the couple's joint checking account, beginning in February 2004. Andy testified that he did not pay for any of the children's necessities or obligations, *Page 260 
did not help with any of the marital obligations for the two homes, and April continued to pay his cell phone bill during this period.
 ¶ 30. The chancellor's determination that this factor favored Andy lacks an evidentiary basis. At a minimum, this factor favored neither party. There is much evidence that April demonstrated the willingness and capacity to provide primary care for her children. She took on a job that required her to work some nights, in order to provide financially for the children. The children were adequately cared for by their father while April was working. April left the job that required her to be away from her children and began a new career that allowed her flexibility to care for her children as well as to support them financially.
4. Moral fitness
 ¶ 31. The chancellor correctly found that both parties are guilty of adultery. There appears to have been no problems with their marriage before Andy engaged in an adulterous affair with his then-pregnant[4] and married secretary. His affair began in February 2002 and continued through March 2002. For well over a year, Andy kept the affair secret from April. He never told her of the affair, his betrayal of her trust, his breach of the marital vows, or the health risks that she may have been exposed to as a result of the affair. Shortly after his affair ended, Andy erupted violently toward April.
 ¶ 32. The chancellor recognized Andy's violent behavior. The children witnessed Andy strike April, knocking her to the ground and causing her nose to bleed. There was also evidence in the record that Andy would knock holes in the walls during his outburst. The chancellor determined that this would support a finding for April. However, the chancellor then inexplicably disregarded Andy's violence and relied on April's extramarital affair to determine that the factor favored Andy. The chancellor concluded that Andy's past failures were less likely to be detrimental to the future of the children than were April's present failures. Again, there is no evidence in the record to support this conclusion.
 ¶ 33. Here, both parents engaged in extramarital affairs. Andy before the separation, and April after the separation. It seems as if the chancellor rationalized that Andy's affair was in the past and did not involve the children. Without any evidence to support the conclusion, the chancellor found that the children were not affected by Andy's affair, but were affected by April's present relationship. The evidence established that the children have been affected by their parents' divorce. However, there is no evidence that they were specifically adversely affected by April's relationship. The chancellor appears to have disregarded his finding of Andy's violence and completely ignored the impact that Andy's affair had on the family unit.
 ¶ 34. Where both parties engage in extramarital affairs, neither should get the benefit of a finding of moral fitness.Fulk v. Fulk, 827 So.2d 736, 740(1115) (Miss.Ct.App. 2002). For example, in Fulk, we held that it was error to weigh a mother's affair with a woman more heavily than the father's instigation and involvement in the menage a trois relationship between the three. Id.
Andy's affair with his pregnant secretary clearly is at the root of the disintegration and termination of this marriage. To give Andy credit in the custody determination because he kept his affair *Page 261 
secret, hidden from his wife, does not entitle him to any favorable consideration under the moral fitness factor.
 ¶ 35. Additionally, it is error to ignore Andy's past violent behavior toward April. Id. at 741 (¶ 17). Frankly, it is beyond our understanding how Andy could be favored on this factor. His infidelity and his violence should be sufficient to prevent the chancellor from giving him the favorable finding under this factor. Likewise, April's affair does not merit much greater consideration. We conclude that the chancellor was clearly in error and manifestly wrong on this issue.
5. Home, school and community record of the children
 ¶ 36. The chancellor's initial analysis of this factor is appropriate. The children have attended a local Christian school and have done well. They have resided in several different homes, all of which were in the same community. Emma Kate is enrolled in dance. Noah is playing soccer and t-ball. Both parents have extended family in the community. This factor is neutral. But, the chancellor goes too far in his analysis by attempting to predict the future.
 ¶ 37. The chancellor found that the record supported the children remaining in the community, and he then determined that April was more likely to leave the community. There was no evidence in the record to support this conclusion. April did not testify to any plans to move from the community. While Brian was employed in another town, there was testimony that April and Brian had no immediate plans of marriage. April's mother, brother and grandparents live in the community. From the evidence, April is just as likely to remain in the community as Andy. We find that the record does not support the chancellor's conclusion. This factor favors neither Andy nor April.
6. Other relevant factors
 ¶ 38. The chancellor found that appreciation of sacrifice which being a good parent entails was another relevant factor. The chancellor determined that Andy demonstrated that he will subordinate his interest to the interest of his children. The chancellor concluded that April is not so willing to sacrifice. He found that April prefers to attempt to balance the children's interest with her interest and rationalize her conduct. These conclusions are wholly unsupported by the record. There is no requirement that following a divorce the custodial parent remain single and devote his or her entire life only to the children. Indeed, after the termination of the marriage, it should be expected that single parents will socialize and will possibly remarry. Such conduct may not be punished.
 ¶ 39. As stated above, we find that the chancellor's findings are manifestly wrong, clearly erroneous, and are not supported by substantial credible evidence. Therefore, we reverse and remand the custody determination to the chancellor for further proceedings consistent with this opinion.
III. Did the chancellor err in his award of visitation?
 ¶ 40. Because we remand for further proceedings on the issue of custody, we decline to address the issues that relate to the award of visitation. On remand, the chancellor will have an opportunity to consider visitation.
 IV. Did the chancellor err by not following the mandates of the custody statute when evidence of domestic violence was presented?
 ¶ 41. April also argues that the chancellor was in error by not making specific *Page 262 
findings of violence by Andy, as required by Mississippi Code Annotated Section 93-5-24(9). The relevant portion of the chancellor's opinion states:
 Noah does not understand why his parents are separated. He has inquired about such matters. He also had previously witnessed physical confrontations between his parents. On one occasion while arguing, [April] struck [Andy] and [Andy] then struck [April] causing her nose to bleed. This was very upsetting to Noah, and he attempts to get between his parents when they are arguing. Arguing and physical contact between the parents was not unusual in the home. Both have pushed and fought. [Andy] has knocked holes in walls. He sometimes loses his temper as this conduct demonstrates.
 ¶ 42. Mississippi Code Annotated Section 93-5-24(9) (Rev. 2004) provides:
 (a) (i) In every proceeding where the custody of a child is in dispute, there shall be a rebuttable presumption that it is detrimental to the child and not in the best interest of the child to be placed in sole custody, joint legal custody or joint physical custody of a parent who has a history of perpetrating family violence. The court may find a history of perpetrating family violence if the court finds, by a preponderance of the evidence, one (1) incident of family violence that has resulted in serious bodily injury to, or a pattern of family violence against, the party making the allegation or a family household member of either party. The court shall make written findings to document how and why the presumption was or was not triggered.
 (ii) This presumption may only be rebutted by a preponderance of the evidence.
 (iii) In determining whether the presumption set forth in subsection (9) has been overcome, the court shall consider all of the following factors:
 1. Whether the perpetrator of family violence has demonstrated that giving sole or joint physical or legal custody of a child to the perpetrator is in the best interest of the child because of the other parent's absence, mental illness, substance abuse or such other circumstances which affect the best interest of the child or children;
 2. Whether the perpetrator has successfully completed a batterer's treatment program;
 3. Whether the perpetrator has successfully completed a program of alcohol or drug abuse counseling if the court determines that counseling is appropriate;
 4. Whether the perpetrator has successfully completed a parenting class if the court determines the class to be appropriate;
 5. If the perpetrator is on probation or parole, whether he or she is restrained by a protective order granted after a hearing, and whether he or she has complied with its terms and conditions; and
 6. Whether the perpetrator of domestic violence has committed any further acts of domestic violence.
 (iv) The court shall make written findings to document how and why the presumption was or was not rebutted.
 (b) (i) If custody is awarded to a suitable third person, it shall not be until the natural grandparents of the child have been excluded and such person shall not allow access to a violent parent except as ordered by the court.
 (ii) If the court finds that both parents have a history of perpetrating family violence, but the court finds that parental custody would be in the best interest *Page 263 
of the child, custody may be awarded solely to the parent less likely to continue to perpetrate family violence. In such a case, the court may mandate completion of a treatment program by the custodial parent.
 (c) If the court finds that the allegations of domestic violence are completely unfounded, the chancery court shall order the alleging party to pay all court costs and reasonable attorney's fees incurred by the defending party in responding to such allegations.
 (d)(i) A court may award visitation by a parent who committed domestic or family violence only if the court finds that adequate provision for the safety of the child and the parent who is a victim of domestic or family violence can be made.
 (ii) In a visitation order, a court may take any of the following actions:
 1. Order an exchange of the child to occur in a protected setting;
 2. Order visitation supervised in a manner to be determined by the court;
 3. Order the perpetrator of domestic or family violence to attend and complete to the satisfaction of the court a program of intervention for perpetrators or other designated counseling as a condition of visitation;
 4. Order the perpetrator of domestic or family violence to abstain from possession or consumption of alcohol or controlled substances during the visitation and for twenty-four (24) hours preceding the visitation;
 5. Order the perpetrator of domestic or family violence to pay a fee to defray the cost of supervised visitation;
 6. Prohibit overnight visitation;
 7. Require a bond from the perpetrator of domestic or family violence for the return and safety of the child; or
 8. Impose any other condition that is deemed necessary to provide for the safety of the child, the victim of family or domestic violence, or other family or household member.
 (iii) Whether or not visitation is allowed, the court may order the address of the child or the victim of family or domestic violence to be kept confidential.
 (e) The court may refer but shall not order an adult who is a victim of family or domestic violence to attend counseling relating to the victim's status or behavior as a victim, individually or with the perpetrator of domestic or family violence, as a condition of receiving custody of a child or as a condition of visitation.
 (f) If a court allows a family or household member to supervise visitation, the court shall establish conditions to be followed during visitation.
 ¶ 43. Andy argues that this issue is not appropriate because it is first argued on appeal. April responds that Section 93-5-24(9) applies "[i]n every proceeding where the custody of a child is in dispute," and does not require a party to plead or specifically request the chancellor to follow the dictates of the statute. Indeed, based on the chancellor's specific findings of violence and a history of violence, Section 93-5-24(9) is applicable. On remand, the chancellor is directed to consider and comply with Section 93-5-24(9).
 ¶ 44. THE JUDGMENT OF THE LOWNDES COUNTY CHANCERYCOURT IS REVERSED AND REMANDED FOR FURTHER PROCEEDINGSCONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL AREASSESSED TO THE APPELLEE. *Page 264 
KING, C.J., AND LEE, P.J., SOUTHWICK, CHANDLER, BARNES, ISHEE AND ROBERTS, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY. MYERS, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.
[1] We recognize that the Uniform Chancery Court Rules do not contain a provision similar to Rule 4.03 of the Uniform Circuit and County Court Rules, which requires a "memorandum of authorities in support of any motion to dismiss or for summary judgment . . . [and] an itemization of the facts relied upon and not genuinely disputed. . . ."
[2] In the order, the chancellor states that "[t]he defendant [Andy] has filed a motion for partial summary judgment, with supporting affidavits." Indeed, in the record, there are copies of affidavits from Andy. However, these affidavits were filed well in advance of the motion for summary judgment and there was nothing to indicate that the affidavits were filed to support the motion.
[3] The Albright factors include:
 The age of the child . . . should carry no greater weight than other factors to be considered, such as: health, and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to the parent-child relationship.
Albright, 437 So.2d at 1005.
[4] The secretary was pregnant with her own husband's child, not Andy's.